UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

HEMLOCK SEMICONDUTOR CORPORATION,

                    Plaintiff,                      Case No. 15-cv-11236

v                                      Honorable Thomas L. Ludington

KYOCERA CORPORATION,

                    Defendant.

_____/

**ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS, DISMISSING COUNTERCLAIMS, GRANTING PLAINTIFF'S MOTION TO STRIKE JAPANESE ANTITRUST DEFENSE, STRIKING JAPANESE ANTITRUST DEFENSE, DENYING WITHOUT PREJUDICE DEFENDANT'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS, GRANTING PLAINTIFF'S MOTION TO QUASH NON-PARTY SUBPOENAS, AND SCHEDULING RULE 16(b) SCHEDULING CONFERENCE**

Plaintiff Hemlock Semiconductor ("Hemlock") and Defendant Kyocera are significant participants in the global solar energy industry. Their immediate dispute arises from a series of contracts for the sale of quantities of industrial-grade polycrystalline silicon by Hemlock to Kyocera. Following changes in global solar market conditions, Kyocera sought to excuse its performance under a force majeure provision in the parties' contracts. In response, Hemlock sought adequate assurances that Kyocera would perform its obligations under the agreements. When Hemlock concluded that Kyocera had not provided adequate assurances that it would perform its contractual commitment, it initiated this suit.

Hemlock filed its initial complaint on April 1, 2015, and filed an amended complaint on April 29, 2015. ECF No. 4. Now before the Court are three motions filed by Hemlock on August 3, 2015: (1) Motion to Dismiss Defendant Kyocera Corporation's Counterclaims, ECF No. 21; (2) Motion to Strike Defendant Kyocera Japanese Antitrust Defense, ECF No. 22; and (3)

Motion to Quash Non-Party Subpoenas Issued by Defendant Kyocera Corporation, ECF No. 24. Hemlock's motion to dismiss and motion to strike will be granted. Hemlock's motion to quash non-party subpoenas will be provisionally granted.

Also before the Court are two motions from Kyocera. ECF Nos. 38 and 45. Kyocera's motion for partial judgment on the pleadings will be denied without prejudice, and Kyocera's motion to compel discovery will be addressed at the Rule 16(b) conference.

## I.

Hemlock, Plaintiff in this action, is a Michigan corporation involved in the manufacture and sale of polycrystalline silicon ("polysilicon") and photovoltaic solar cells and modules. ECF No. 4 at ¶¶ 1, 3, 7. The majority of the common stock of Hemlock is owned by Dow Corning Corporation. Shin-Etsu Handotai Co. Ltd. owns a significant minority interest in Hemlock. *See Joint Venture Partners*, HSCPOLY, http://www.hscpoly.com/content/hsc_comp/ownership.aspx. Shin-Etsu is described as "the largest chemical company in Japan." *See Top 100 Global Innovators*, THOMAS REUTERS, top100innovators.stateofinnovation.thomsonreuters.com /content/shin-etsu-chemical. Kyocera, Defendant in this action, is a Japanese corporation that describes itself as "one of the world's largest vertically-integrated producers and suppliers of solar energy panels." ECF No. 4 at ¶ 8.

## A.

In considering Hemlock's motion to dismiss, the Court accepts the facts in a light most favorable to the nonmovant, Kyocera. *See Lambert v. Hartman*, 517 F.3d 443, 439 (6th Cir. 2008). Beginning in 2005, in the face of a worldwide polysilicon shortage, Hemlock and Kyocera entered into four long-term polysilicon supply contracts. The first Long Term Supply Agreement ("Agreement I") is effective from August 30, 2005 to December 31, 2015. The

second Long Term Supply Agreement ("Agreement II") is effective from July 21, 2006 to December 31, 2018. The third Long Term Supply Agreement ("Agreement III") is effective from July 18, 2007 to December 31, 2019.   Finally, the fourth Long Term Supply Agreement ("Agreement IV") is effective from November 13, 2008 to December 31, 2020.  Am. Compl. at ¶¶ 12-13. The agreements require Kyocera to make large initial payments to assist Hemlock's expansion of its existing polysilicon production facilities in the United States.

After the parties entered into the agreements, the global solar industry was affected by Chinese government intervention.  Specifically, the Chinese government provided subsidies to Chinese solar-based companies and facilitated large-scale "dumping" of Chinese solar panels into the global market in order to increase Chinese market share in the solar industry.   In response, in 2012 the United States government imposed anti-subsidy and anti-dumping import tariffs of 24-36 percent on Chinese solar components. These state actions caused the prices of both polysilicon and solar panels to drop precipitously.

In response to the falling market prices, the parties agreed to short-term contract modifications in 2011 and 2012 that lowered the gross price and the advance payment for those years. These modifications did not affect any other contract terms or future pricing schedules. While the short-term price amendments came to an end, the Chinese market saturation and resulting trade war did not.  From mid-2014 to early 2015, Kyocera proposed additional price modifications, all of which Hemlock rejected.

**B.**

After failing to reach a modification agreement, Kyocera sent notice to Hemlock in February 2015 that it was exercising a contractually bargained-for right to invoke the force majeure provision of Agreement IV.  Hemlock refused to recognize Kyocera's invocation of any

force majeure rights, contending that the force majeure provision in Agreement IV did not excuse Kyocera from performance because of the changing solar-market conditions. Consequently, on February 13, 2015 Kyocera filed suit in Michigan state Court seeking a declaration that its contractual performance could be excused by Agreement IV's force majeure clause.

On June 16, 2015, the Michigan State trial court granted Hemlock's motion for summary disposition, finding that the change in market conditions did not implicate Agreement IV's force majeure clause. On December 3, 2015, the Michigan Court of Appeals affirmed, explaining that Kyocera had assumed the market risks that gave rise to the alleged liability and that "the plain language of the force majeure clause at issue does not permit relief to plaintiff on the grounds that the market for polysilicon has shifted, regardless of the cause of that shift." *Kyocera Corp. v. Hemlock Semiconductor*, 15-025786-CK *2 (Mich. Ct. App. Dec. 3, 2015), ECF No. 58 Ex. A.

## C.

On February 26, 2015 Hemlock sent Kyocera a demand for adequate assurances that it would perform under Agreements I-III pursuant to MCLA § 440.2609. Compl. ¶ 28. Kyocera sent Hemlock a response on March 26, 2015, arguing that Kyocera had no obligation to provide written assurances to Hemlock and that MCLA § 440.2609 did not apply to the supply agreements. *Id.* at ¶ 29. Hemlock then initiated the instant suit on April 1, 2015 alleging that Kyocera had failed to provide Hemlock with adequate assurances that it would make purchases under the supply agreements in 2015. Am. Compl. ¶ 28. Two days later, on April 3, 2015, Kyocera filed a complaint against Hemlock in the Civil Division of Tokyo District Court in Japan. The Tokyo complaint alleges that Hemlock violated Japanese antitrust law by abusing a

superior position of bargaining power in entering into the supply agreements.  That case remains pending.

On July 7, 2015 Kyocera filed an answer to Hemlock's amended complaint, listing twenty-five affirmative defenses and seven counterclaims. ECF No. 9.  Hemlock responded on August 3, 2015 by filing a motion to dismiss Kyocera's counterclaims, a motion to strike Kyocera's Japanese Antitrust Defense, and a Motion to quash non-party subpoenas. ECF Nos. 21-22, 24. Subsequently, on September 15, 2015 Kyocera filed a motion for partial judgment on the pleadings. ECF No. 38.  Finally, on October 8, 2015, Kyocera filed a motion to compel discovery. ECF No. 45.  Each of these pending motions will be addressed in turn.

**II**.

The Court first addresses Plaintiff Hemlock's motion to dismiss Defendant Kyocera's seven counterclaims. ECF No. 21.  This Court may dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert*, 517 F.3d at 439. The pleader need not have provided "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Furthermore, the legal effects of contractual clauses are questions of law that must be reviewed de novo.  *Quality Products and Concepts Co. v. Nagel Precision, Inc.,*666 N.W.2d 362, 369 (Mich. 2003).  In essence, the pleading "must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, (quoting *Twombly*, 550 U.S. at 570).

Kyocera has brought the following seven counterclaims against Hemlock that Hemlock now moves to dismiss: (1) Declaratory Judgment of Impracticability/Impossibility; (2) Declaratory Judgment of Frustration of Purpose; (3) Declaratory Judgment of Force Majeure for Agreement III; (4) Declaratory Judgment that Agreements I-III are Void for Violations of Public Policy, Including Illegality; (5) Declaratory Judgment that Agreements I-III are Void for Mutual Mistake; (6) Unjust Enrichment; and (7) Breach of Agreements I-III. *See* ECF No. 9 47-60.

Five of the seven counterclaims seek declaratory judgments. Under the Declaratory Judgment Act, a district courts may "[i]n a case or controversy, within its jurisdiction ... declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (2012). There is no clear rule addressing whether a declaratory judgment action meets the Article III case and controversy requirement, however, parties involved must have "adverse legal interests," and there must be an actual dispute that relates to the "legal relations[hip]" between them. *Medlmmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 (2007). The parties' dispute must be the kind that requires the "specific" and conclusive relief that a declaratory judgment offers. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937). The party seeking the declaratory judgment has the burden of demonstrating that an actual case or controversy exists.

## A.

Kyocera's first counterclaim seeks a declaratory judgment that Kyocera is relieved from performance under Agreements I-III on a theory of impracticability/impossibility.  Answer to Am. Compl. ¶¶ 71-81, ECF No. 9. Generally, under Michigan law, "[e]conomic unprofitableness

[sic] is not the equivalent to impossibility of performance. Subsequent events which in the nature of things do not render performance impossible, but only render it more difficult, burdensome, or expensive, will not operate to relieve [a party of its contractual obligations]." *Chase,* 217 N.W. at 567. See, also *Milligan* 295 N.W. at 563, and *Sheldon* 29 N.W.2d at 835.

The Sixth Circuit considered a set of claims similar to those now before this Court in *Karl Wendt Farm Equipment Co., Inc. v. International Harvester Co.*, 931 F.2d 1112, 1117-18 (6th Cir. 1991). In holding that impracticability was an "inappropriate defense" in that case, the Court explained:

> The fact that [Defendant] experienced a dramatic downturn in the farm equipment market and decided to go out of the business does not excuse its unilateral termination of its dealership agreements due to impracticability. [Defendant] argues that while mere unprofitability should not excuse performance, the substantial losses and dramatic market shift in the farm equipment market between 1980 and 1985 warrant the special application of the defense in this case. [Defendant] cites losses of over $2,000,000.00 per day and a drop in the company's standing on the Fortune 500 list from 27 to 104…. [Defendant] also put on evidence that if it had not sold its farm equipment division, it might have had to declare bankruptcy. While the facts suggest that [Defendant] suffered severely from the downturn in the farm equipment market, neither market shifts nor the financial inability of one of the parties changes the basic assumptions of the contract such that it may be excused under the doctrine of impracticability.

*Id*.

Kyocera argues that *Karl Wendt* is inapplicable here. Specifically, Kyocera claims that *Karl Wendt* was limited to its particular facts and that the Court acknowledged the defense of impracticality/impossibility was available in other factual situations. Kyocera also argues that *Karl Wendt* is distinguishable in that it did not involve claims of "illegal or non-routine actions, much less concerted, continuous, and illegal series of acts to override free market forces, as was alleged here." ECF No. 34 at 15.

These arguments are without merit.  The alleged illegal acts of the Chinese government have no bearing on whether Kyocera's performance has become impossible or impracticable. Rather, the alleged illegal acts have simply caused a market shift in pricing, making it unprofitable for Kyocera to continue to perform as promised.  Regardless of the cause of the market shift, Kyocera's allegations amount only to claims of "economic unprofitableness," which are insufficient to give rise to claims of impossibility or impracticability.  *See Chase,* 217 N.W. at 567.  Kyocera's first counterclaim will thus be dismissed.

**B.**

Kyocera next seeks a declaratory judgment that it is relieved from performance under Agreements I-III on a theory of frustration of purpose. Answer to Am. Compl. ¶¶ 82-92. "Frustration of purpose is generally asserted where a change in circumstances makes one party's performance virtually worthless to the other…." *Liggett,* 676 N.W.2d at 637 (internal citations and quotations omitted).  Application of the doctrine of frustration is a question of law and not a question of fact. *See* Restatement (Second) of Contracts, 310 (1979); *See also Columbian National Title Insurance Company v. Township Title Services, Inc.,* 659 F.Supp. 796 (D.Kan.1987).

For a party to avail itself of the defense of frustration of purpose under Michigan law it must prove the following conditions:

> (1) the contract must be at least partially executory; (2) the frustrated party's purpose in making the contract must have been known to both parties when the contract was made; (3) this purpose must have been basically frustrated by an event not reasonably foreseeable at the time the contract was made, the occurrence of which has not been due to the fault of the frustrated party and the risk of which was not assumed by him.

*Molnar v. Molnar*, 313 N.W.2d 171, 173 (Mich. Ct. App. 1981).

- 8 -

The first prong is satisfied, since all three agreements are executory. Under the first agreement, the parties are obligated to perform through the 2015 calendar year.  Under the second and third agreements, the parties are obligated to perform through 2018 and 2019 respectively.  Thus the parties have continuing performance obligations under all three agreements at issue.

The second prong turns on the primary purpose of the contract. According to the Restatement (Second) of Contracts, "It is not enough that he had in mind some specific object without which he would not have made the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense." Restatement (Second) of Contracts § 265.

In its counterclaim, Kyocera alleges that the purpose of the contract was "to create a long-term agreement in which Kyocera would help Hemlock grow its manufacturing capabilities, and in which Hemlock would use that expanded production to provide Kyocera with a stable supply of polysilicon within a legally functioning market." ECF No. 9.  Although all of the nonmovant's factual allegations must be accepted as true in reviewing a motion to dismiss, legal conclusions need not be taken as true.  *See Lambert*, 517 F.3d at 439.  To determine the intent of the parties, courts must enforce unambiguous contracts according to their terms. *See Quality Products*, 666 N.W.2d at 370-71.  "[A]n unambiguous contractual provision is reflective of the parties' intent as a matter of law." *Id.* at 375.

Kyocera's contention regarding the primary purpose of the agreements goes too far. The unambiguous primary purpose of the agreements was for Hemlock to provide Kyocera with a stable supply of polysilicon at a predictable price. This is apparent by the preambles of the agreements, which provide, "…Buyer desires to purchase and [Hemlock] agrees to sell Products

(herein defined) pursuant to the terms and conditions of this Agreement."   *See* ECF No. 1, Exhibit 1 at 1, Exhibit 2 at 1, Exhibit 3 at 1. It is also apparent by the parties' choice to structure their relationship in the form of long-term requirement contracts in order to provide some stability in fluctuating markets.  Any express or implied understanding that Hemlock would expand its production capabilities was collateral to this central purpose.

Under the third prong, the primary purpose must have been "basically frustrated by an event not reasonably foreseeable at the time the contract was made, the occurrence of which has not been due to the fault of the frustrated party and the risk of which was not assumed by him." *Molnar*, 313 N.W.2d at 173.  In general, "[i]t is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss." *Seaboard Lumber Co. v. U.S.*, 41 Fed.Cl. 401, 417 (Fed.Cl.1998). "The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract." *Id.* (quoting Restatement (second) of Contracts § 265 (1981)). "[A] lack of profit is generally insufficient to frustrate the purpose of a contract." *Seaboard Lumber*, 41 Fed.Cl at 418.

Regardless of any changes in the polysilicon market and regardless of the cause of those changes, Hemlock is still able to provide Kyocera with a stable supply of polysilicon at a predictable price.  There is no allegation that Hemlock can no longer provide polysilicon to Kyocera, and there is no allegation that there is no longer an existing market for solar products. Kyocera simply claims that it can no longer act profitably in the international solar market if it must honor its supply agreements with Hemlock.  A party's claim that it is unable to conduct business profitably is insufficient to state a claim of frustration of purpose.[1]  As a matter of law, the primary purpose of the agreements between Hemlock and Kyocera has not been frustrated.

---

[1] It is unclear whether the defense of frustration of purpose can even justify rescission of a contract under Michigan law. *See Liggett*, 676 N.W.2d at 637; *See also Klein Steel Services Inc. v. Sirius Protection, LLC*, 2014 WL 1685912

Kyocera argues that the illegal actions of a third party, the Chinese government, in manipulating the solar markets were unforeseeable. However, because the Chinese Government's actions did not have an effect on the principal purpose of the agreement – Hemlock providing Kyocera with a stable supply of polysilicon at a predictable price – whether those acts were foreseeable is not material. Under the doctrine of frustration of purpose, foreseeability is only relevant to the extent that it relates to an action that frustrates the primary purpose of a contract. *See Molnar*, 313 N.W.2d at 173.

Kyocera also argues that it should not have to bear the entire risk of harm resulting from China's illegal disruption of the solar market. ECF No. 34 at 11. However, Kyocera concedes that the agreements were initiated "[t]o combat the instability in the solar market." ECF No. 34 at 3. In setting forth long-term price and quantity schedules, both parties accepted a risk that future market developments would work against them. Hemlock accepted the risk that polysilicon prices would increase, requiring them to sell to Kyocera at below market prices. Kyocera accepted the risk that prices would decrease, requiring them to buy from Hemlock at above market prices. More likely than not one party to the contract would profit and one would lose based on changes in the market price. In this circumstance Kyocera ended up on the losing end of the equation.

## C.

In its third counterclaim, Kyocera seeks a declaratory judgment that the force majeure provision of Agreement III excuses its performance. Answer to Am. Compl. ¶¶ 93-107. The effect of a force majeure clause is to excuse performance in the event an unforeseen

---

(E.D. Mich. 2014). Federal courts in Michigan have dismissed claims for rescission on this ground. *See, e.g. Klein Steel Services*, WL 1685912 at *4. A party can, however, seek restitution under a theory of frustration of purpose if that party has conferred any benefits on the opposing party through partial performance. *See Jabero v. Harajli,* 2004 WL 1335896 at *3 (Mich.Ct.App. 2004).

circumstance occurs." *Melford Olsen Honey, Inc. v. Adee*, 452 F.3d 956, 963 (8th Cir.2006).

"The performance to be excused is determined by the language of the clause." *Id.* The

"bargained for" force majeure clause found in Agreement III provides:

> HSC shall not be liable for delays or failures in performance of an order or default
> in the delivery arising out of or resulting from causes beyond its control.  Such
> causes include, but are not limited to, acts of God, acts of Buyer, acts of the
> Government or the public enemy, fire, flood, epidemics, quarantine restrictions,
> strikes, freight embargoes, severe weather, equipment breakage or default of
> suppliers due to any of such causes.  In the event of any such delay of HSC's
> performance, Buyer shall honor its obligations hereunder as soon as HSC is able
> to perform.
>
> If HSC fails to deliver or Buyer fails to Purchase Product…and such failure
> occurs as the result of a Force Majeure Event, HSC may deliver and Buyer may
> purchase the deficient Product, (at the prevailing contract price which was in
> effect during the Force Majeure Event), within a reasonable time after resolution
> of the Force Majeure Event, (determined by mutual agreement of the parties).
> The term of this Agreement may be extended for a period not to exceed one (1)
> year so as to complete the purchase and delivery of deficient Product.  HSC will
> provide Buyer notice of the deficient Product delivery schedule for the deficient
> Product prior to delivery as well as notice of its request to extend the Terms of the
> Agreement.
>
> In addition, if due to force majeure or any other cause, HSC is unable to produce
> sufficient goods to meet all demands from customers and internal uses, HSC shall
> have the right to allocate production among its customers and plants in any
> manner which HSC may determine to be equitable.

*See* Exhibit 3 § 19, ECF No. 28.

Force majeure is not a contract defense under Michigan Law, but it can be a bargained-

for contract provision or protection.  *See Hemlock Semiconductor Corp. v. Deutsche Solar*

*GmbH*, 2015 WL 4476327 (E.D. Mich. 2015).   Numerous courts have refused to apply

contractual force majeure clauses where "governmental action affects the profitability of a

contract, but does not preclude a party's performance." *United Sugars Corp. v. U.S. Sugar Co.,*

*Inc.,* 2015 WL 1529861 (D.C. Minn. 2015). *See also Seaboard Lumber Co. v. United States,* 308

F.3d 1283, 1293–94 (Fed.Cir.2002) (declining to apply the force majeure clause because the risk

that market price will make performance unprofitable is inherent in fixed-price contracts); *In re Millers Cove Energy Co.,* 62 F.3d 155, 159 (6th Cir.1995) (holding that "lack of economic feasibility" does not exclude contract performance under contract's force majeure clause absent specific language to that effect)*; Langham–Hill Petroleum, Inc. v. S. Fuels Co.,* 813 F.2d 1327, 1330 (4th Cir.1987) (rejecting application of force majeure clause where foreign government acted to cause a collapse in world oil prices, making the contract unprofitable for one party); *N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co.,* 799 F.2d 265, 274–76 (7th Cir.1986) (holding that the government's denial of a party's request to pass increased coal prices along to its customers did not excuse that party from a long-term contract to buy coal even though performance created economic hardship); *B.F. Goodrich Co. v. Vinyltech Corp.,* 711 F.Supp. 1513, 1519 *(D.Ariz.1989)* (rejecting the argument that an unexpected drop in market price was within the scope of the contract's force majeure clause).

The most analogous case to the present case is *Langham-Hills*. There, following the collapse of the world crude oil market because of Saudi Arabian attempts to acquire market share, Southern Fuels attempted to invoke a force majeure clause in its fixed price petroleum supply contract with Langham-Hills. *Langham Hills, 813* F.2d at 1329.  Langham-Hills then brought suit against Southern Fuels in federal district court for breach of contract.  *Id*.  Declining to find a contractual force-majeure clause applicable, the district court granted Langham-Hills motion for summary judgment.  The Fourth Circuit Court of Appeals affirmed, citing "the law of contracts and the realities of the business world."  *Id*.  The Fourth Circuit explained that "[i]f fixed-price contracts can be avoided due to fluctuations in price, then the entire purpose of fixed-price contracts, which is to protect both the buyer and the seller from the risks of the market, is defeated."  *Id*. at 1330. The Court then quoted the Seventh Circuit:

[the defendant] committed itself to paying a price at or above a fixed minimum and to taking a fixed quantity at that price. It was willing to make this commitment to secure an assured supply of [the product], but the risk it took was that the market price of [the product or substitutes] would fall. A force majeure clause is not intended to buffer a party against the normal risks of a contract. The normal risk of a fixed price contract is that the market price will change. If it rises, the buyer gains at the expense of the seller (except insofar as escalator provisions give the seller some protection); if it falls, as here, the seller gains at the expense of the buyer. The whole purpose of a fixed price contract is to allocate risks in this way. A force majeure clause interpreted to excuse the buyer from the consequences of the risk he expressly assumed would nullify a central term of the contract.

*Id*. (quoting *N. Ind. Pub. Serv.,* 799 F.2d at 275). *See also In re Millers Cove Energy Co., Inc.,* 62 F.3d 155, 158 (6th Cir. 1995) (adopting the Fourth Circuit's reasoning in *Langham-Hill*).

The "bargained for" force majeure provision in Agreement III does not excuse Kyocera from performing under the circumstances alleged. First, by its express terms the protections of the force majeure clause as written was to protect Hemlock from unanticipated events, not Kyocera. *See* Exhibit 3 § 19, ECF No. 28 ("[Hemlock] shall not be liable for delays or failures in performance of an order or default in the delivery arising out of or resulting from causes beyond its control"). Second, the contractual provision only addresses events that give rise to an actual, physical inability to perform, not those that only make performance inconvenient. *Id*. Third, the force majeure provision does not allow a total rescission of the contract or excuse from performance, but merely provides for a delay in performance. *Id.* ("In the event of any such delay of HSC's performance, Buyer shall honor its obligations hereunder as soon as [Hemlock] is able to perform"). Accordingly, Kyocera's claim that an unfavorable market fluctuation warrants excuse of performance under Agreement III's force majeure clause is without merit as a matter of law and will be dismissed.

**D.**

- 14 -

In its fourth counterclaim, Kyocera seeks a declaratory judgment that Agreements I-III are void for violations of public policy, including illegality. *See* Answer to Am. Compl. ¶¶ 108-115. Specifically, Kyocera argues that the Agreements violate Article 19 of Japanese Antimonopoly Law and Article 90 of the Japanese Civil Code, which prohibits contract provisions that are against the public order and morals. Hemlock moves to dismiss this counterclaim on the grounds that Kyocera has failed to plead any facts in support of its Japanese antitrust claim and Kyocera has not alleged that the Supply Agreements violate antitrust law on their face. In the alternative, Hemlock argues the claim should be dismissed in consideration of principles of international comity.

In its response to Hemlock's motion to dismiss, Kyocera asserts that its counterclaim for declaratory judgment under Japanese antitrust laws should not be dismissed because its Tokyo district court complaint has been incorporated into its answer and counterclaims. Kyocera further argues that its Japanese antitrust claim will be decided by a Japanese court, and so this Court will not need to consider any complex factual issues related to the claims. Kyocera concludes that comity considerations weigh in favor of allowing the Japanese court to determine if Hemlocks' agreements violate Japanese law before this Court determines if that illegality bars enforcement. Kyocera in effect argues that this Court should apply the doctrine of abstention, staying consideration of the present matter until the Tokyo courts have decided the Japanese antitrust issue. Kyocera then seeks to apply the principal of collateral estoppel to the Tokyo judgment in this Court.

Hemlock argues that Kyocera has failed to state a claim upon which relief may be granted. To raise a claim under Federal Rule of Civil Procedure 8(a), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief". *Id.* A

pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). The "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, (quoting *Twombly*, 550 U.S. at 570).

Kyocera does not identify any legal theory or claim beyond a conclusory assertion that the Agreements violate Japanese Antitrust law.  Kyocera states only that "the contracts are invalid because the contract clauses of the trading establish contract terms unilaterally disadvantageous to Kyocera and are against the public order and morals… in Japan."  Answer to Am. Compl. ¶ 111.  Kyocera then claims that it is "entitled to a declaration that the Agreements are void because, among other things, they are illegal under Japanese law, and it is not liable for delays in performance of its obligations under the agreements." *Id.* at ¶ 115.  Kyocera has not provided this Court with a recitation of the elements of the cause of action, much less any explanation as to how the facts support such a theory of recovery.  Because Kyocera has not provided any explanation as to how the Supply Agreements violate the public order and morals in Japan, Kyocera has not stated a claim upon which relief may be granted under Japanese antitrust law. *See Oparaugo v. Watts,* 884 A.2d 63, 72 (D.C. 2005) (holding that the district court acted properly in refusing a plaintiff's request to apply foreign law where the plaintiff failed to provide any information regarding the elements of the foreign law or any information as to how the foreign law should be applied in assessing the sufficiency of his complaint).

Furthermore, in its response to Hemlock's motion for summary judgment, Kyocera states that "[t]he antitrust issues underlying Kyocera's claim will be decided by the Japanese Court. Kyocera is not asking this Court to consider any complex factual issues related to Kyocera's antitrust claims." Resp. to Mot. to Dismiss Counterclaims 27. Accordingly, despite styling its counterclaim as a motion for declaratory judgment, Kyocera does not appear to seek a declaration about the parties' rights or a decision concerning Kyocera's legal claim. Instead, it apparently seeks a declaratory judgment that any decision by the Tokyo district court in its favor has collateral estoppel effect. Kyocera has not only failed to state a claim upon which relief may be granted, but Kyocera has also failed to state a demand for the relief it actually seeks or any allegations in support of that relief. *See* Fed. R. Civ. P. 8(a)(3).

Kyocera's claim that the antitrust issue will be decided by a Japanese court is problematic for an additional reason: the Supply Agreements contain both a forum selection clause and a choice-of-law provision that preclude this Court from recognizing any decision by a Japanese Court. The choice of forum provision states that the parties "submit to the exclusive jurisdiction and venue of the U.S. District Court for the Eastern District of Michigan for all disputes arising, directly or indirectly, under [the Supply Agreements]." Agreements I-III ¶ 21. The choice-of-law provision provides that the Supply Agreements "shall be governed and controlled in all respects by the laws of the State of Michigan, USA… and all disputes, including interpretation, enforceability, validity, and construction, shall be determined under the law of the State of Michigan, without regard to any conflict of law provision." *Id.* at ¶ 20. Michigan public policy "favors the enforcement of contractual forum-selection clauses and choice-of-law provisions." *Turcheck v. Amerifund Financial, Inc.*, 725 N.W.2d 684, 688 (Mich. Ct. App. 2006). Indeed, this point will be further discussed below in part III.B.

Because Kyocera has not stated a foreign antitrust counter-claim upon which relief may be granted and because this Court cannot grant Kyocera the relief it seeks — recognition of a Japanese district court judgment — Kyocera's fourth counterclaim will be dismissed.

**E.**

In its fifth counterclaim, Kyocera claims that Agreements I-III are voidable for mutual mistake. *See* Answer to Am. Compl. ¶¶ 116-22. Kyocera argues that the parties were mutually mistaken in assuming that the polysilicon market would continue to legally function. *Id*. at 118-19. Hemlock moves to dismiss this counterclaim, arguing that the doctrine of mutual mistake relates only to "fact[s] in existence at the time the contract is executed" and not to predictions as to occurrences or non-occurrences.

As explained by the Michigan Supreme Court, a mutual mistake excusing performance must relate to facts in existence at the time the contract is executed. *Lenawee Cty. Bd. of Health v. Messerly*, 331 N.W.2d 203, 207 (Mich. 1982). In other words "the belief which is found to be in error may not be, in substance, a prediction as to a future occurrence or non-occurrence." *Id*. Mistaken expectations alone do not relate to a fact in existence at the time of the agreement. *Akahoshi v. S. Waste Servs.,* 181 F. Supp. 2d 711, 714 (E.D. Mich. 2001). "Moreover, rescission of a contract for mutual mistake is not available where the party seeking rescission has assumed the risk of loss in connection with the mistake." *Id*.

Kyocera's claim of mutual mistake amounts to an assertion that it was mistaken in its failure to anticipate future market disruptions. This allegation does not raise a claim of mutual mistake for two reasons. First, mistaken expectations about market behavior do not relate to a fact in existence at the time the Supply Agreements were executed. Second, in entering into the long-term supply agreements, Kyocera accepted the risk that the market prices for polysilicon

would decrease, thereby rendering its performance unprofitable. *See Seaboard Lumber,* 308 F.3d 1293–94 (holding that the risk that market price will make performance unprofitable is inherent in fixed-price contracts); *Langham Hills, 813* F.2d at 1330 (holding that the entire purpose of fixed-price contracts is to protect both the buyer and the seller from the risks of the market). Because Kyocera has failed to state a claim of mutual mistake, its fifth counterclaim will be dismissed.

**F.**

Kyocera next alleges that the large advanced payments it has paid to Hemlock constitute unjust enrichment and violate Japanese antitrust law. *See* Answer to Am. Compl. ¶¶ 123-28. Hemlock argues this counterclaim should be dismissed because the advanced payments were expressly agreed to by the parties.

Unjust enrichment is a common law remedy whereby the law implies a contract in order to prevent unjust enrichment, specifically when one party inequitably receives and retains a benefit from another. *See Martin v. East Lansing School Dist*., 483 N.W.2d 656 (Mich. Ct. App. 1992). To proceed on such a claim, a plaintiff must establish (1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant. *Barber v. SMH (US), Inc.*, 509 N.W.2d 791 (Mich. Ct. App. 1993). "However, a contract will be implied only if there is no express contract covering the same subject matter." *Belle Isle Grill Corp. v. Detroit*, 666 N.W.2d 271 (Mich. Ct. App. 2003). In other words, the law will not imply a contract where there is an express contract between the same parties on the same subject matter. *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898 (Mich. Ct. App. 2006) (quoting 42 CJS IMPLIED AND CONSTRUCTIVE CONTRACTS § 34, p. 33).

Here, Agreement I contains an advance payment clause, expressly providing:

Non-Refundable Advance Payment. Buyer agrees to make a non-refundable, unconditional, irrevocable advance payment in the amount of $36,120,000.00 (the "Advance Payment"). Fifty percent (50%) of the Advance Payment shall be due on or before October 3, 2005 and the remaining fifty percent (50%) shall be due on or before October 2, 2006. Notwithstanding anything herein to the contrary, Buyer expressly acknowledges its understanding and agrees that, once this Agreement is executed, there are no circumstances or occurrences that will require [Hemlock] to refund to Buyer all or any portion of the Advance payment. The Advance Payment shall be applied as a credit against the price of the Products that Buyer is required to purchase under this Agreement at the times and amounts shown [in the schedules].

Agreement I ¶ 2. Agreement II contains the same clause, but requires a $48,000,000.00 advance payment to be paid in installments on or before October 4, 2006, October 4, 2007, and October 4, 2008. Agreement II ¶ 2.

Agreement III contains a similar clause, requiring a $84,915,000.00 advance payment to be paid in installments on or before October 4, 2007, October 4, 2008, and October 4, 2009. Agreement III ¶ 2. The clause differs from the previous two advance payment clauses in that it allows Kyocera to recover a portion of the advance payment if it sustains loss, damage, or injury resulting from Hemlock's failure to perform, specifically in situations involving a delay in Hemlock's completion of its expanded manufacturing facility. *Id*. at ¶¶ 2, 9, 15. Agreement III limits any such liability to the "remaining net balance of the advanced payment", and provides that, "[e]xcept for situations involving a delay in completion of the manufacturing facility… [Hemlock] shall not be liable for any loss, damage, or injury resulting from delay in delivery of the products, or for any failure to perform which is due to circumstances beyond its control." *Id*. ¶ 15 (original in all-caps).

Because the Supply Agreements expressly contemplate and govern Kyocera's non-refundable advance payments to Hemlock, Kyocera cannot recover its advance payments by

implied contract. *See Belle Isle*, 666 N.W.2d at 281 (concluding that a plaintiff could not recover costs of improvement by implied contract where his lease expressly provided for capital improvements in lieu of rent). *See also Liggett Restaurant Group, Inc. v. City of Pontiac*, 676 N.W.2d 633, 639 (Mich. Ct. App. 2003) (holding that the trial court properly dismissed the plaintiff's unjust enrichment claim where there was an express provision in the parties' contract contemplating the subject matter of the dispute); *Fodale v. Waste Mgmt. of Mich., Inc.*, 718 N.W.2d 827, 841 (2006) (holding that a plaintiff was foreclosed from bringing an unjust enrichment claim where an express contract governed the parties' loan).

Kyocera argues that, despite the existence of express contracts governing the advance payments, it may still proceed on its unjust enrichment counterclaim because the Supply Agreements are invalid or unenforceable. In *H.J. Tucker and Associates, Inc. v. Allied Chucker and Engineering Co.*, the Michigan Court of Appeals held that a party could proceed on its unjust enrichment claim where an express oral contract existed, but where there was a material question as to the scope of the oral contract or whether the contract was still in force. 595 N.W.2d 176 (Mich. Ct. App. 1999). The court explained that the plaintiff could have recovered under its breach of contract claim for the period of time that the contract was in force, and could recover under its unjust enrichment claim for the period of time the contract was allegedly not effective. *Id*. In the alternative, the court explained, the trial court could find that recovery under unjust enrichment doctrine was appropriate if it found there was no contract between the parties due to the dispute regarding material contract terms.

Unlike in *H. J. Tucker*, here the Supply Agreements are express *written* agreements. Neither the scope nor the terms of the agreement are in dispute. Instead, Kyocera argues only that the Supply Agreements are not enforceable contracts due to violations of Japanese antitrust

law and mutual mistake. However, because Kyocera cannot proceed on either theory as a matter law, *See* I.D. and I.E. *supra*, Kyocera cannot, as a matter of law, argue that the express contracts are unenforceable under either theory.

Kyocera argues that it should be allowed to proceed on its unjust enrichment counterclaim because it is not *in pari delicto* with Hemlock. Kyocera argues that if the Supply Agreements are found to be illegal agreements under Japanese antitrust law, this Court should not simply leave the parties as it finds them (the proper course of action when the Court is asked to aid either party to an illegal agreement. *Jones v. Chennault*, 35 N.W. 2d 256, 267 (Mich. 1948)). Instead, Kyocera argues, because any illegality under Japanese antitrust law would be the result of Hemlock's abuse of its superior bargaining power, the parties are not *in pari delicto* because Kyocera's payments were a product of that abuse. *Id.*

On the present facts, the argument is academic. Because Kyocera has failed to properly plead any claims under Japanese antitrust law, Kyocera cannot allege in this action that the Supply Agreements are unenforceable under Japanese antitrust law.

Finally, Kyocera argues that Hemlock will be unjustly enriched if it is allowed to retain the advance payments because Kyocera only committed to the advance payment arrangement based on Hemlock's promise that it would use the payments to expand its polysilicon production facilities. However, because express written agreements exist between the parties, Kyocera cannot challenge the fairness of the contract terms it agreed to or its performance under the express contract terms on a *quantum meruit* theory of unjust enrichment. If Kyocera seeks to challenge the fairness of the express contract terms, it must do so under claims of unconscionability, duress or fraud. Kyocera may only challenge Hemlock's performance under the express contract terms by asserting a breach of contract claim.

- 22 -

## G.

In its seventh counterclaim Kyocera alleges that Hemlock has breached the ¶ 9 of the Supply Agreements by failing to maintain expanded manufacturing facilities. *See* Answer to Am. Compl. ¶¶ 129-134. Hemlock moves to dismiss that counterclaim, arguing that Kyocera has not alleged the breach of any express provision of the Supply Agreements.

To state a breach of contract claim under Michigan law, a plaintiff must plead "(1) that there was a contract, (2) that the other party breached the contract and, (3) that the party asserting breach of contract suffered damages as a result of the breach." *Dunn v. Bennett*, 846 N.W.2d 75 (Mich.Ct.App.2013). The first prong requires an express promise, as "Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing." *Fodale,* 718 N.W.2d at 841.

The disputed provision of the Supply Agreements, ¶ 9, provides: "Buyer acknowledges that [Hemlock] will be expanding its manufacturing facilities… in order to produce the Products to be supplied under this Agreement." Agreements I-III ¶ 9. That paragraph further provides: "Buyer acknowledges the possibility of delays in completing the manufacturing facility and expressly agrees that, so long as production of Product commences by [June 30, 2008/June 30, 2009/June 30, 2010], [Hemlock] SHALL HAVE NO LIABILITY TO BUYER FOR ANY SUCH DELAY." *Id*. (emphasis in originals).

Kyocera argues that ¶ 9 amounts to an express promise by Hemlock to maintain expanded manufacturing capacities. Kyocera cites *Sexton v. Panel Processing, Inc.,* for the proposition that a promise is defined as "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promise in understanding that a commitment has been made." 912 F. Supp. 2d 475, 478 (E.D. Mich. 2013) *aff'd* 754 F.3d 332, 334 (6th Cir), *cert.*

- 23 -

*Denied*, 135 S. Ct. 677 (2014). Kyocera argues that the language of ¶ 9 stating that Hemlock "will be expanding" is a manifestation of intention to act. Kyocera concludes that, viewing the facts in a light most favorable to Kyocera, ¶ 9 supports Kyocera's allegation of an express contract term and a subsequent breach. As a result of this alleged breach, Kyocera claims that it has suffered damages because it has not received what it bargained for in exchange for its advance payments.

Hemlock, in contrast, argues that ¶ 9 is not an express promise, but merely serves as an acknowledgment by Kyocera that Hemlock would be expending substantial capital improvements to expand its manufacturing capacity. Hemlock argues that the purpose of that acknowledgment was that Hemlock would eventually credit Kyocera's advance payments against Kyocera's take-or-pay obligations. Hemlock further argues that, because no provision in the agreement requires Hemlock to maintain expanded manufacturing facilities, Kyocera's breach of contract claim should be dismissed.

Viewing the facts in a light most favorable to Kyosera and assuming that ¶ 9 amounts to an express promise by Hemlock to expand its manufacturing facilities, there is nothing in the Supply Agreements that supports Kyocera's allegation that Hemlock agreed to *maintain* expanded manufacturing facilities. At most, the provision could amount to a promise by Hemlock to expand its manufacturing facilities to meet Kyocera's product demands under the Supply Agreements. Accordingly, Kyocera's claim will be dismissed to the extent that it suggests that Hemlock breached the Supply Agreements by failing to maintain expanded facilities.

Turning to Hemlock's alleged promise to expand, Kyocera admits in its answer that Hemlock's expanded production facility in Tennessee was completed, but notes that it was

permanently closed in December 2014. Answer to Am. Compl. ¶ 20. Kyocera also alleges that Hemlock did not expand other facilities to the extent contemplated by the parties. *Id*. at ¶ 133. In this way, Kyocera argues, Hemlock has breached a promise to perform.

It is not enough for Kyocera to allege that Hemlock breached a promise to perform. Under Michigan law, Kyocera must also allege that it "suffered damages as a result of the breach." *Dunn*, 846 N.W.2d at 275.  Kyocera makes no allegation that Hemlock has been unable to meet its obligation to fulfill Kyocera's demands for polysilicon under the Supply Agreements — indeed, the basis of this lawsuit is Kyocera's suggestions that it no longer has any demand whatsoever for Hemlock's polysilicon at the agreed upon prices.  Kyocera thus does not allege damages in the form of Hemlock's failure to meet its product demands.

Kyocera does allege that it was damaged by not receiving what it bargained for in exchange for its advance payments. Kyocera argues that because it agreed to the advanced payments for the purpose of allowing Hemlock to expand its manufacturing facilities, it has been injured as a result of Hemlock's failure to sufficiently expand its facilities.  However, by the very terms of the advanced payment provision, Kyocera agreed "to make a non-refundable, unconditional, irrevocable advance payment" and expressly acknowledged its understanding and agreed that, "once this Agreement is executed, there are no circumstances or occurrences that will require [Hemolock] to refund to [Kyocera] all or any portion of the Advance Payment." Agreements I-III ¶ 2.  Nothing in the Supply Agreements suggests that the advanced payments were in consideration for the expanded facilities.  Instead, all three contracts are clear that the advanced payments were "non-refundable, unconditional, [and] irrevocable."  *Id*. at ¶ 9.  The Supply Agreements further explain that the only circumstance or occurrence requiring Hemlock to refund a portion of the advance payment is if, as a result of Hemlock's delay in completing its

expanded manufacturing facility, Kyocera suffered loss, damage or injury resulting from (1) Hemlock's delay in delivery or (2) Hemlock's "failure to perform which is due to circumstances beyond its control." *Id*. at ¶ 15.   Because Kyocera has not pled any loss, damage, or injury in either form, it has not stated an injury under the Supply Agreements or under Michigan law.   At the time of the agreements, Kyocera agreed to the non-refundable, unconditional, and irrevocable advanced payments.   It cannot now, with the benefit of hindsight, recast the nature of those advanced payments.

Furthermore, Kyocera's advanced payments to Hemlock are to be "applied as a credit against the price of the Products that Buyer is required to purchase under this Agreement at the times and amounts shown [in the schedules]."   Accordingly, any damages that Kyocera suffers relating to the advanced payment is a result of its decision to cease performance under the agreed upon terms of the Supply Agreements.   If Kyocera continued to perform as promised, then the advance payments would continue to be credited against Kyocera's subsequent purchases.

In conclusion, even assuming that Hemlock promised to expand its manufacturing facilities, Kyocera has not pled any actionable damages resulting from any breach of that promise.   Kyocera's seventh counterclaim will thus be dismissed.

**III**.

Also before the Court is Hemlock's Motion to strike Kyocera's tenth affirmative defense, relating to violations of Japanese antitrust law. Mot. to Strike, ECF No. 24.   Hemlock argues that Supreme Court precedent, as well as this Court's recent decision in *Hemlock Semiconductor Corp. v. Deutsche Solar GmbH,* 2015 WL 4476327 (E.D.Mich. May 7, 2015) support its motion. In response Kyocera argues that this case is distinguishable from *Deutsche Solar* because Kyocera is not asking the Court to adjudicate any foreign antitrust claim, but is instead asking

the Court to "respect a Japanese court's adjudication of a pending Japanese antitrust claim." Resp. to Mot. to Strike 1, ECF No. 33.

A "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A defense is insufficient "if as a matter of law, the defense cannot succeed under any circumstances." *Hahn v. Best Recovery Servs., LLC*, 2010 WL 4483375, *2 (E.D. Mich. Nov.1, 2010) (internal quotation marks and citations omitted). A Rule 12(f) motion is also proper "if it aids in eliminating spurious issues before trial, thereby streamlining the litigation." *Id.* (internal quotation marks and citation omitted). "Generally, however, a Rule 12(f) motion should not be granted if the insufficiency of the defense is not clearly apparent, or if it raises factual issues that should be determined on a hearing on the merits." *Id.* (internal quotation marks and citation omitted). Motions seeking to strike an affirmative defense are disfavored and should be used sparingly. As observed by the Sixth Circuit, a motion to strike "is a drastic remedy to be resorted to only when required for purposes of justice. The motion to strike should be granted only when the pleading to be stricken has no possible relation to the controversy." *Brown & Williamson Tobacco Corp. v. United States,* 201 F.2d 819, 822 (6th Cir. 1953) (internal quotation marks and citations omitted).

### A.

The Supreme Court has twice addressed the question of when a contract's illegality under antitrust laws and regulations can serve as an affirmative defense in a contract-enforcement action. *See Kelly v. Kosuga*, 358 U.S. 516 (1959), and *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982). Under those opinions, a party can usually raise a claim of illegality under antitrust law in a contract dispute only where a provision is patently illegal and not severable from the sued-upon provision. *See Hemlock Semiconductor Corp. v. Deutsche Solar GmbH*, 2015 WL 4476327 (May

7, 2015). Here, there is no patent illegality in the supply agreements. Rather, Kyocera argues that the Supply Agreements violate Japanese antitrust law if Hemlock abused a position of bargaining power in arriving at the agreements.

**i.**

The District of Columbia Circuit addressed an affirmative antitrust defense that did not allege patent antitrust illegality in *National Souvenir Center, Inc. v. Historic Figures, Inc.*, 728 F.2d 503 (D.C. Cir. 1984). *National Souvenir* arose out of "a series of pre-trial rulings by the district court in three consolidated anti-trust cases involving wax museums[.]" *Id*. at 506. After a wax museum in Washington D.C. began franchising museums throughout the United States, the franchisees sued, claiming that the agreements violated the Sherman Act because they impermissibly tied a certain supplier's figures to the museum franchise. *Id*. The franchisor and owners responded by asserting a breach of contract counterclaim, to which the franchises defended by alleging that the agreements were illegal tying agreements under the Sherman Act. In dismissing the defense, the district court concluded that the defense could not be sustained under *Kaiser Steel* because "the promise being sued on is not itself illegal under the antitrust laws, [and so] *Kaiser* did not require recognition of the defense." *Id*. at 508 (quoting opinion below) (internal quotation marks omitted).

In reviewing the district court opinion, the District of Colombia Circuit Court noted that "*Kosuga* was generally viewed as permitting antitrust defenses only in a very narrow class of contract suits, courts being understandably hesitant to interpose complex antitrust issues in a simple suit for breach of contract." *Id*. The circuit court then read *Kosuga* to limit antitrust defenses to situations where "the requested enforcement was of agreements not to compete or other direct market restrictions, that made 'the court . . . a party to an anticompetitive scheme.'"

- 28 -

*Id.* (quoting *Mullins v. Kaiser Steel Corp.*, 642 F.2d 1302 (D.C. Cir. 1980)). The circuit court noted that the Supreme Court in *Kaiser Steel* "opened the window only a notch to antitrust defenses, i.e., it refused to enforce a promise to pay that was itself a mechanism to police anticompetitive conduct." *Id.* In distilling the two cases, the circuit court determined the relevant inquiries are (1) whether the agreement to be enforced is facially illegal under federal antitrust laws (the *Kosuga* question) and (2) whether the agreement to be enforced is itself a mechanism to enforce a collateral agreement or provision that facially violates federal antitrust laws.

In the case before it, the District of Columbia Circuit determined that "the promises to pay franchise fees in this case do not appear on their face to be primarily means to enforce the allegedly illegal tie-ins between the wax figures and start-up services." *Id.* Rather, they appeared to be merely consideration for goods and services, or nothing more than an inoffensive market transaction. *Id.* Importantly, the court held:

> To transform the contracts here into illegal tie-ins would require complex proof of monopoly power in the tying market and leverage of that power in the tied market. Even then, their vice would extend only to the amount that the agreed prices exceeded the fair value of the goods and services received and consumed—the portion of the prices that could be traced to the illegal practice. The complexity of proof and speculative nature of appellants' defenses seem to us to place them outside of the [*Kaiser Steel*] exception and clearly within the ambit of disfavor for such defenses articulated in *Kosuga*.

*Id.* at 515-16. Stated differently, not only was the promise the court was asked to enforce not patently illegal, but fulfilling the promise did not force the franchisees to comply with another portion of the agreement that was patently illegal. Any illegality under a collateral provision of the agreement would only arise under the presence of specific market conditions external to the agreement and upon which the agreement does not rely.

**ii.**

- 29 -

Here, Kyocera does not challenge any specific provision of the Supply Agreements as patently illegal under Japanese Antitrust law. Instead, Kyocera argues that the Supply Agreements are wholly invalid and unenforceable under Japanese Antitrust law because "Hemlock abused its superior bargaining position to obtain punitive terms from Kyocera in violation of Japan's Anti-Monopoly Act ("AMA"). Resp. to Mot. to Strike 5. Kyocera argues that, although Hemlock's market dominance is probative, it is not required under Japanese antitrust law, and that Kyocera's claim does not need to allege any market-control thresholds or any particular market share. *Id*. at 6.

Kyocera makes no allegation that the Supply Agreements either (1) facially violate Japanese Antitrust law or (2) serve as a mechanism to facially violate Japanese Antitrust law. As such, Kyocera's claim of wholesale unenforceability under a broad and amorphous provision of Japanese antitrust law is not a defense in this breach of contract case.

Kyocera attempts to distinguish this case from *Kaiser Steel* and *Kosuga* by arguing that those cases involved situations where one party had already received the property of another and the complaining party sought to avoid paying for the delivered goods. In contrast, Kyocera argues that there are no delivered goods in the present case and that it is being forced to pay for goods that it has not received. First, the decision to cease acceptance of goods under the Supply Agreements is Kyocera's. If Kyocera honored the terms and schedules that it agreed to in the Supply Agreements, then its advance payments would continue to be credited against its future purchases. Second, and more importantly, this is not a material distinction and has no bearing on the question of whether it is appropriate for this Court to entertain a foreign anti-trust defense as part of a Michigan breach of contract case.

- 30 -

Kyocera also argues that, like in *Kaiser Steel*¸ the Supply Agreements require Kyocera to pay a penalty if it selects any supplier other than Hemlock.  Kyocera cites to no provision of the Supply Agreements supporting such an argument, and there is in fact no provision of the Supply Agreements requiring Kyocera to pay a penalty if it uses polysilicon suppliers other than Hemlock.  Furthermore, Kyocera provides no explanation as to how any such provision would violate *Japanese* antitrust law — the law that Kyocera attempts to raise in its defense.  The fact that such conduct was found to facially violate United States antitrust law in *Kaiser Steel* is irrelevant where Kyocera has not pled as a defense any violations of United States antitrust law.

**B.**

Kyocera also attempts to distinguish this case from *Deutsche Solar* by arguing that this Court should *not in fact adjudicate* any Japanese antitrust issues.  *Id*. at 7.  Kyocera instead argues that this Court should apply the doctrine of abstention and, if and when the Japanese court issues a final and valid judgment on the antitrust issue, review the Japanese court's findings and determine whether the decision renders Hemlock's contract unenforceable in the United States. *Id*.

Abstention from the exercise of federal jurisdiction is a "narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976).  It is "the exception, not the rule." *Id*. *Colorado River* instructed courts to consider several factors in determining whether to abstain in favor of a parallel proceeding in the courts of another sovereign, the most important factor being whether there exists a "clear federal policy evinc[ing] ... the avoidance of piecemeal adjudication." *Id*. Additional factors include how far the parallel proceeding has advanced in the other sovereign's courts, the number of defendants and complexity of the proceeding, the

convenience of the parties, and whether a sovereign government is participating in the suit. *See Answers in Genesis of Kentucky, Inc. v. Creation Ministries Intern., Ltd.,* 556 F.3d 459, 467 (6th Cir. 2009).

As to breach of contract cases, there is no clear federal policy evincing the avoidance of piecemeal adjudication. There is, however, a clear federal policy in favor of enforcing bargained for forum selection clauses. *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 991-92 (9th Cir. 2006). American courts will generally only recognize foreign judgments that are both final and valid. *See Pilkington Bros. P.L.C. v. AFG Industries Inc.,* 581 F.Supp. 1039, 1045 (D. Del. 1984). Even where a party obtains a final and valid foreign judgment, a court may refuse to recognize the judgment "where the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by proceedings in that foreign court." 2005 Recognition Act § 4(c)(5); 1962 Recognition Act § 4(b)(5). In *Bremen v. Zapata Off-Shore Co.*, the United States Supreme Court held that, where a choice of forum was made "in an arm's-length negotiation by experienced and sophisticated businessmen… absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts." 407 U.S. 1, 11 (1972). In order to overcome this presumption a party must show that the provision in question was affected by "fraud, undue influence, or overweening bargaining power." *Id*. at 12. The Court concluded that, "in the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside." *Id*. at 15. Circuit Courts have applied this *Bremen* test to choice of law provisions as well as choice of forum provisions. *See Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1292 (11th Cir. 1998).

The Supply Agreements contain a choice of forum provision stating that the parties "submit to the exclusive jurisdiction and venue of the U.S. District Court for the Eastern District of Michigan for all disputes arising, directly or indirectly, under [the Supply Agreements]." Agreements I-III ¶ 21. The Supply Agreements also contain a choice of law provision, providing that the Supply Agreements "shall be governed and controlled in all respects by the laws of the State of Michigan, USA… and all disputes, including interpretation, enforceability, validity, and construction, shall be determined under the law of the State of Michigan, without regard to any conflict of law provision." *Id*. at ¶ 20. Michigan public policy "favors the enforcement of contractual forum-selection clauses and choice-of-law provisions." *Turcheck v. Amerifund Financial, Inc.*, 725 N.W.2d 684, 688 (Mich. Ct. App. 2006). Importantly, Kyocera has not challenged the enforceability of either provision in its pleadings or responses.

Kyocera's antitrust defense will be stricken; first, because it does not meet the requirements of *Kaiser Steele* and *Kosuga* to be proper for this Court's determination as part of this breach of contract action, and second, because even if Kyocera obtained a final judgment from the Tokyo District court, the Supply Agreements' forum selection provision and choice of law provision would preclude this Court from recognizing the foreign judgment.

## IV.

The final substantive motion before the Court at this time is Kyocera's motion for partial judgment on the pleadings. ECF No. 38. Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." The standard of review for a motion for judgment on the pleadings is the same as that applied to motions to dismiss under Rule 12(b)(6). *See, e.g., Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir.2007); *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 11 (6th

Cir.1987) (noting that where a Rule 12(b)(6) defense of failure to state a claim upon which relief can be granted is raised by a Rule 12(c) motion for judgment on the pleadings, the Court must apply the standard for a Rule 12(b)(6) motion). Accordingly, "[f]or purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir.2007) (internal citations and quotation marks omitted).

In its Rule 12(c) motion, Kyocera requests that the Court dismiss Hemlock's claim for accelerated damages. Kyocera argues that the accelerated damages provisions in the Supply Agreements do not approximate Hemlock's actual damages but instead serve as unenforceable penalties. Hemlock responds that it is not in fact seeking accelerated termination damages in this litigation. Resp. to Mot. for J. on Pleadings, ECF No. 48.

Because Hemlock is not seeking accelerated damages at this time, and because this Court's jurisdiction extends only to actual cases and controversies, Kyocera's motion for judgment on the pleadings will be denied.  If and when Hemlock seeks accelerated damages, Kyocera may renew its challenge to the accelerated damage provisions.

## V.

Also before the Court is Hemlock's motion to quash non-party subpoenas issued by Kyocera.  The scope of discovery is governed by Federal Rule 26(b)(1), which as of December 1, 2015 provides:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the

- 34 -

> burden or expense of the proposed discovery outweighs its likely benefit.
> Information within this scope of discovery need not be admissible in evidence to
> be discoverable.

Fed. R. Civ. P. 26(b)(1). The 2015 Committee notes explain that "[t]he parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." Rule 26(b)(2)(C) provides additional limitations on the scope of discovery, explaining that the Court must limit the extent of discovery if it determines that "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;".

Under Federal Rule 45(d)(3), upon a timely motion, the Court must quash or modify a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies" or a subpoena that "subjects a person to an undue burden." Rule 45(d)(3)(A)(iii)-(iv). The Court may quash or modify a subpoena that requires disclosing trade secrets or other confidential information. Rule 45(d)(3)(B).

Hemlock moves to quash non-party subpoenas served on the following attorneys in companion cases: (1) Daniel Malone, the attorney for Deutsche Solar GmbH in *Deutsche Solar* and attorney for both Green Energy Technology, Inc. and Tatung Co. in *Hemlock Semiconductor Corporation v. Green Energy Technology Inc., et al.*, No. 13-020593 (Mich. Cir. Ct. Saginaw Cnty. 2013); (2) Larry Elliot, attorney for Deutsche Solar in *Deutsche Solar*; and (3) David Tsai, attorney for both Green Energy and Tatung in *Green Energy*. Hemlock argues that the documents Kyocera seeks are subject to protective orders entered by the Courts in both *Deutsche Solar* and *Green Energy*, and that Hemlock has a privilege and proprietary interest in the documents. Hemlock further argues that the subpoenas should be quashed under Rule 45(d)(3), since Hemlock is in possession of all of the documents and depositions sought by Kyocera and

because Kyocera has already requested the exact same documents from Hemlock pursuant to Rule 34. In opposition to Hemlock's motion, Kyocera argues that its third-party requests are proper because the documents have already been gathered and produced and because Hemlock has indicated that it will force Kyocera to engage in motion practice before it will produce the materials in question.

### A.

"[A] party generally has no standing to seek to quash a subpoena directed to a non-party." *Systems Products and Solutions, Inc. v. Scramlin*, 2014 WL 3894385 *7 (E.D. Mich. August 8, 2014) (internal quotations and citation omitted). A party establishes standing if it carries its burden of persuading the court that it has a claim of personal interest or privilege in the material sought by the third-party subpoenas. *Id*. Here, because the relevant documents relate to lawsuits in which Hemlock was a party and are covered by protective orders, Hemlock has shown privilege conferring standing.

### B.

At this time, Kyocera's non-party subpoenas will be provisionally quashed for two reasons: First, because the information it seeks from the non-parties is covered by protective orders, thus making it privileged material under Rule 26(b)(1); second, because the subpoenas are unreasonably cumulative or duplicative under Rule 26(b)(2)(C) and Kyocera is able to obtain the same material directly from Hemlock. If Hemlock makes the discovery process unduly expensive, inconvenient or burdensome, then this order will be revisited and Kyocera may be allowed to reissue subpoenas to the non-parties.

### VI.

The final motion currently before this Court is Kyocera's motion to compel discovery. This motion will be addressed during the Rule 16(b) scheduling conference scheduled below.

**VII.**

Accordingly, it is **ORDERED** that Plaintiff Hemlock's motion to dismiss Defendant Kyocera's counterclaims, ECF No. 21, is **GRANTED**.

It is further **ORDERED** that Defendant Kyocera's counterclaims Nos. I-VII are **DISMISSED**.

It is further **ORDERED** that Plaintiff Hemlock's motion to strike Defendant Kyocera's Japanese antitrust defense, ECF No. 22, is **GRANTED**.

It is further **ORDERED** that Defendant Kyocera's Japanese antitrust defense, Affirmative Defense No. 10, is **STRICKEN**.

It is further **ORDERED** that Defendant Kyocera's motion for partial judgment on the pleadings, ECF No. 38, is **DENIED without prejudice**.

It is further **ORDERED** that Plaintiff Hemlock's motion to quash non-party subpoenas, ECF No. 24, is **PROVISIONALLY GRANTED**.

It is further **ORDERED** that the non-party subpoenas issued to Attorneys Daniel Malone, Larry Elliott, and David Tsai are **QUASHED**.

It is further **ORDERED** that a Rule 16(b) scheduling conference is **SCHEDULED** for **March 9, 2016 at 4:00 PM** at the United States Courthouse, 1000 Washington Avenue, Bay City, Michigan, 48708.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: January 6, 2016

- 37 -

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 6, 2016.

s/Michael A. Sian
MICHAEL A. SIAN, Case Manager